**NOT FOR PUBLICATION**                                         **CLOSED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                                    :
HARTZ MOUNTAIN INDUSTRIES, INC.  :
And SALVATORE GENTILE,              :
                                                    :          Civil Action No. 05-2530 (JAP)
           Plaintiffs,                        :
                                                    :          **OPINION**
           v.                                     :
                                                    :
COLONEL RICHARD J. POLO, JR., as  :
Commander and District Engineer, New :
York District, United States Army Corps of :
Engineers, UNITED STATES ARMY     :
CORPS OF ENGINEERS, an agency of the :
United States government, and          :
MEADOWLAND MILLS/MACK-CALI, LP:
                                                    :
           Defendants.                      :
_____:


APPEARANCES:

Keith E. Lynott
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
P.I. Box 652
Newark, New Jersey 07101-0652

   *Attorneys for Plaintiffs Hartz Mountain Industries, Inc. and Salvatore Gentile*

Benjamin Clarke
DE COTIIS, FITZPATRICK, COLE & WISLER, LLP
Glenpointe Centre West
500 Frank W. Burr Blvd.
Teaneck, NJ  07666
(201) 928-1100

Virginia S. Albrecht
Eric J. Murdock
David C. Lashway
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, DC  20006
(202) 995-1500
(Admitted *Pro Hac Vice*)

*Attorneys for Defendant Meadowlands Mills/Mack-Cali Limited Partnership*

Kelly A. Johnson
Acting Assistant Attorney General
Environment and Natural Resources Division
Eileen T. McDonough
Eric G. Hostetler
Lauren Fischer
Ruth Ann Storey
Environmental Defense Section
UNITED STATES DEPARTMENT OF JUSTICE
Post Office Box 23986
Washington, D.C.  20026-3986
(202) 514-3126

Christopher J. Christie
UNITED STATES ATTORNEY
Susan Handler-Menahem
Assistant United States Attorney
970 Broad Street, Suite 700
Newark, NJ  07102
(973) 645-2843

*Attorneys for Defendants United States Army Corps of Engineers and Colonel Richard J. Polo, Jr.*

PISANO, District Judge.

## I.   INTRODUCTION

Plaintiffs Hartz Mountain Industries, Inc. ("Hartz") and Salvatore Gentile brought this action against the United States Army Corps of Engineers and Colonel Richard J. Polo, Jr. (collectively, the "Army Corps") as well as the Meadowlands Mills/Mack-Cali Limited Partnership ("Mills/Mack-Cali").  Plaintiffs challenge a permit issued by the Army Corps that allows Mills/Mack-Cali to fill waters of the United States in East Rutherford, New Jersey in connection with the construction of a retail, office, hotel, and entertainment development project called "Xanadu."  The Army Corps and Mills/Mack-Cali each filed motions to dismiss challenging the Plaintiffs' standing.  This Court has jurisdiction under 28 U.S.C. § 1331.  For the reasons expressed below, the Court grants Defendants' motions to dismiss.

## II.  FACTUAL BACKGROUND

The Xanadu project is a mixed-use redevelopment of the Continental Airlines Arena site, a 93-acre parcel located within the New Jersey Meadowlands at the Meadowlands Sports Complex in East Rutherford, New Jersey.  (Compl. ¶ 1; Army Corps Br. at 1; Mills/Mack-Cali Br. at 1).  The New Jersey Meadowlands encompass approximately 32 square miles in New Jersey's Bergen and Hudson counties.  (Compl. ¶ 10).  The New Jersey Meadowlands is an environmentally sensitive area for which New Jersey has enacted legislation seeking to preserve the delicate balance of nature and to provide for protection from air and water pollution and orderly, comprehensive development of the Meadowlands.  (Compl. ¶ 12); N.J.S.A. 13:17-1. The property on which Xanadu's construction is planned is owned by the New Jersey Sports and

3

Exposition Authority ("NJSEA").  (Compl. ¶ 1).  The NJSEA was created by the New Jersey

legislature in 1971 and was empowered to construct, operate, and maintain a sports complex in

the New Jersey Meadowlands.  N.J.S.A. 5:10-1, *et seq.*; (Compl. ¶ 13).

NJSEA selected Mills/Mack-Cali's Xanadu project from among competing

redevelopment proposals.  In June 2002, the NJSEA issued a Request for Proposals ("RFP")

seeking proposals for redevelopment of the Continental Airlines Arena site.  (Compl. ¶ 16).  The

RFP indicated that NJSEA sought to "'creat[e] a multi-use destination at the Arena site that

capitalizes on existing uses at the Meadowlands and expands the product mix in a manner that is

complementary to those uses, without materially competing with existing business in the

Meadowlands District.'" (Compl. ¶ 17 (citing NJSEA, Meadowlands Sports Complex,

*Redevelopment of the Continental Airlines Arena Site, Master Developer Request for Proposal*

(June 2002)).  The RFP noted that the site contained wetlands.  (*Id*.).  Following interested

developers' submissions of proposals and oral presentations, the NJSEA announced three

finalists:  Mills/Mack-Cali, Hartz, and Westfield Corporation.  (Compl. ¶ 21).  In February 2003,

NJSEA selected Mills/Mack-Cali's proposal for the construction of Xanadu.  (Compl. ¶ 22).  In

December 2003, NJSEA and Mills/Mack-Cali entered into a Redevelopment Agreement setting

forth terms under which Mills/Mack-Cali would construct, operate, and maintain Xanadu.

(Compl. ¶ 23).  If constructed as authorized by NJSEA, Xanadu will be one of the largest single

private real estate developments in New Jersey.  (Compl. ¶ 34).

Construction of Xanadu will require filling of approximately 8 acres of wetlands.[1]

---

[1] Defendants clarify that the area of wetlands slated to be filled is 7.69 acres.
(Mills/Mack-Cali Br. at 1; Army Corps. Br. at 1, 5; Cole Cert. Ex. 4 at 1 (Army Corps
Memorandum for Record (March 18, 2005))).

Compl. ¶ 36.  The wetlands at issue are subject to the jurisdiction of the Army Corps and, prior to the commencement of construction activity, Mills/Mack-Cali was required to apply for a fill permit pursuant to the Clean Water Act ("CWA") and the Rivers and Harbors Act ("RHA"). Army Corps Br. at 2-3.  In June 2003, Mills/Mack-Cali submitted an application under Section 10 of the RHA and Section 404 of the CWA for a permit to "'[d]ischarge clean fill material into approximately 7 acres of waters of the United States, including wetlands, to facilitate the construction of the Meadowlands Xanadu Redevelopment Project.'"  (Compl. ¶ 46 (alteration in Compl.) (citation omitted from Compl.)).  The Army Corps conducted a public hearing at which a representative of Hartz appeared.  (Compl. ¶ 46).  There is no indication that Mr. Gentile appeared at or otherwise participated in the public hearing.  On March 18, 2005, the Army Corps issued the fill permit to Mills/Mack-Cali, along with a Memorandum for Record discussing the factors considered by the Army Corps concerning the permit application.  (Compl. ¶ 51).  Hartz had requested that the Army Corps stay the effective date of the permit to allow judicial review; the Army Corps declined to issue a stay.  (Compl. ¶¶ 49-50).

On May 13, 2005, Plaintiffs initiated this action challenging the permit issued by the Army Corps.  Plaintiffs allege violations of the National Environmental Protection Act ("NEPA"),[2] Section 404 of the CWA,[3] Section 10 of the RHA,[4] as well as applicable regulations.

_____

[2] The purpose of NEPA, 42 U.S.C. §§ 4321, *et seq.*, "is to focus national policymaking on the interdependence between human beings and the environment." *Dunn v. U.S.*, 842 F.2d 1420, 1426 (3d Cir. 1988).  NEPA requires, in relevant part, "that federal agencies assess the effects of proposed major federal actions on the human environment." *Id.*  NEPA is essentially a procedural statute and does not requires an agency to reach a particular result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).  Indeed, federal agencies are not required "to elevate environmental concerns over other appropriate considerations"; rather, NEPA mandates "only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Baltimore Gas. & Elec. Co. v. Natural Resources Defense*

Plaintiffs seek declaratory and injunctive relief, including setting aside the permit and ordering the Army Corps to complete a NEPA Environmental Impact Statement.[5]  (Compl. at 38-39).  The Army Corps and Mills/Mack-Cali separately moved to dismiss the Complaint, each alleging that Plaintiffs lack standing to bring the claims asserted.

---

*Council, Inc.*, 462 U.S. 87, 97 (1983).

     NEPA requires federal agencies to prepare analyses in assessing the effects of agency action.  If, after preparing an Environmental Assessment, an agency determines that a proposed action is a "major federal action[] significantly affecting the quality of the human environment," the agency must prepare an  Environmental Impact Statement.  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), 1501.4(e); 42 U.S.C. § 4332(2)(C); *see also Dunn*, 842 F.2d at 1427.  If, however, that agency determines that the proposed action will not have a significant impact, the agency must set forth its reasons in a Finding of No Significant Impact.  *See* 40 C.F.R. §§ 1501.3, 1501.4(c), 1501.4(e), 1508.13; *see also Dunn*, 842 F.2d at 1427.

     [3] The CWA establishes a comprehensive framework designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To achieve this objective, the CWA prohibits the discharge of pollutants into navigable waters, which is defined to includes certain wetlands, unless authorized by a CWA permit.  33 U.S.C. §§ 1311(a), 1362(7); 33 C.F.R. § 328.3(a),(b).  There appears to be no dispute that the wetlands at issue in this litigation constitute waters subject to the CWA.  Pursuant to Section 404 of the CWA, the Army Corps regulates discharges of dredged and fill materials into wetlands through the issuance of permits.  33 U.S.C. § 1344.  CWA regulations establish a case-by-case review process for the issuance of individual permits that involves site-specific documentation and review, opportunity for public hearing, public interest review, and a formal determination.  *See* 33 C.F.R. Pts. 323, 325.

     [4] Section 10 of the RHA requires that a permit issued by the Army Corps be obtained prior to the construction of any obstructions to navigation in the navigable waters of the United States.  33 C.F.R. § 320.2(b); 33 C.F.R. 329.4 (defining "navigable waters of the United States").  There appears to be no dispute that the wetlands at issue in this litigation constitute navigable waters subject to the RHA.  As with CWA Section 404 permits, Army Corps regulations detail the permit application review process.  *See* 33 C.F.R. Pt. 325.

     [5] *See* note 2, *supra*.

## III.  STANDARD OF REVIEW

Defendants' objections to Plaintiffs' standing are challenges to the Court's subject matter jurisdiction and are brought as a motion to dismiss under Fed. R. Civ. P. 12(b)(1).  *See, e.g.*, *Storino v. Borough of Point Pleasant*, 322 F.3d 293, 296 (3d Cir. 2003) (noting that if Plaintiffs do not possess Article III standing, then this Court "lack[s] subject matter jurisdiction to address the merits of [P]laintiffs' case"); *New Hope Books, Inc. v. Farmer*, 82 F. Supp. 2d 321, 324 (D.N.J. 2000).

For purposes of ruling on a motion to dismiss challenging standing, a court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 296 (3d Cir. 2003); *Turicentro, S.A. v. American Airlines, Inc.*, 303 F.3d 293, 300 n.4 (3d Cir. 2002); *Gould Elec., Inc. v. United States*, 220 F.3d 169, 176 (2000).  At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotations and citations omitted) (alterations omitted).  However, "the Court can consider affidavits attached to the moving papers or even require such affidavits to be submitted."  *New Hope Books*, 82 F. Supp. 2d at 324 (citations omitted).  "If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed."  *Warth*, 422 U.S. at 501-02.

Plaintiffs "'bear[] the burden of establishing' the elements of standing, and 'each element must be supported in the same way as any other matter on which the plaintiff bears the burden of

7

proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 838 (1996) (quoting *Lujan*, 504 U.S. at 561).

## IV. DISCUSSION

### A. <u>Legal Framework</u>

"[T]he first and fundamental question" that a federal court must address in each case "is that of jurisdiction." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998). Under Article III of the Constitution, the jurisdiction of federal courts extends only to the resolution of "cases" and "controversies." U.S. Const. Art. III § 2. To demonstrate a case or controversy, a plaintiff must establish standing. *Lujan*, 504 U.S. at 560 ("Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.").

Standing "subsumes a blend of constitutional requirements and prudential considerations." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). The prudential considerations "embod[y] judicially self-imposed limits on the exercise of federal jurisdiction."[6] *Elk Grove United Sch. Dist. v. Newdow*,

---

[6] The prudential rules of standing aid the court in determining whether the plaintiff is a proper party to invoke judicial resolution of the particular dispute. *Mariana v. Fisher*, 338 F.3d 289, 204 (3d Cir. 2003). The prudential requirements are: (1) the plaintiff generally must assert his own, not a third party's, legal rights and interests; (2) the plaintiff must not be asserting a generalized grievance; and (3) the plaintiff's injuries must fall within the zone of interests of the statute at issue. *Society Hill Towers Owners' Assoc. v. Rendell*, 210 F.3d 168, 177-78 (3rd Cir. 2000); *see also Elk Grove*, 542 U.S. 1, 124 S.Ct. at 2308.

542 U.S. 1, 124 S.Ct. 2301, 2308 (2004) (internal quotations and citation omitted); *Lujan*, 504

U.S. at 560.  The "irreducible constitutional minimum of standing" requires:  (1) "the plaintiff

must have suffered an injury in fact – an invasion of a legally protected interest which is (a)

concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2)

"there must be a causal connection between the injury and the conduct complained of–the injury

has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result

[of] the independent action of some third party not before the court"; and (3) "it must be likely,

as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Lujan*, 504 U.S. at 560-61 (internal citations and quotations omitted) (alterations in *Lujan*).

 For the reasons discussed below, the Court concludes that Plaintiffs have demonstrated

neither a cognizable injury in fact nor a causal connection between the alleged injuries and the

challenged conduct.  Plaintiffs therefore lack standing.  Plaintiffs' failure to establish two of the

necessary constitutional elements of standing obviates the need to discuss redressability or the

prudential aspects of the standing inquiry.

### B.  Plaintiffs Have Failed to Establish an Injury in Fact

 Federal courts "do not sit to entertain generalized grievances that are shared by the public

at large."  *Taubman Realty Group Ltd. P'Ship v. Mineta*, 198 F. Supp. 2d 744, 755 (E.D.Va.

2002) (citing *Lujan*, 504 U.S. at 573-74) (addressing injury in fact requirement), *aff'd*, 320 F.3d

475 (4th Cir. 2003).  Rather, "the plaintiff must have suffered an injury in fact – an invasion of a

legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

conjectural or hypothetical."  *Lujan*, 504 U.S. at 560-61 (internal citations and quotations

9

omitted) (alterations in *Lujan*).  This test requires, in addition to injury to a cognizable interest, that the plaintiff be among the injured.  *Sierra Club v. Morton*, 405 U.S. 727, 735-36 (1972).  Where a plaintiff's asserted injury is "plainly undifferentiated and common to all members of the public," that plaintiff lacks standing.  *U.S. v. Richardson*, 418 U.S. 166, 171, 176-177 (1974).  To support standing in a case in which a procedural injury is alleged, harm to concrete, litigant-specific interests must be alleged.  *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 449 (10th Cir. 1996) ("To establish injury in fact for purposes of Article III, a plaintiff must not only show that the agency's disregard of a procedural requirement results in an increased risk of environmental harm, but a plaintiff must also show the increased risk is to the litigant's concrete and particularized interests." (citations omitted)).  A plaintiff's injury "cannot be a general or amorphous harm but must be particular, distinct and concrete."  *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 852 (9th Cir. 1989).

### 1.  Plaintiffs Have Not Established an Injury In Fact as to Hartz

Plaintiffs allege that Hartz's operations will be significantly affected by the effects of constructing and operating Xanadu, including, but not limited to, "adverse traffic impacts on the roadways in or around the Meadowlands, which will directly and negatively impact the ability of employees of Hartz and others to travel to and from the Hartz corporate offices and to and from other properties owned and operated by Hartz in the Meadowlands"[7] and "may also affect the

---

[7] Certain of Plaintiffs' allegations are phrased in terms of injuries that will be suffered by Hartz's employees and others.  However, Hartz clarifies in its Opposition to Defendants' Motions to Dismiss that it does not allege claims of associational standing on behalf of Hartz's employees and customers and does not purport to possess associational standing.  (Plaintiffs' Br. at 5-6).  Hartz thus can only rely on injuries to itself for purposes of standing and can only assert claims on its own behalf.

ability of Hartz to attract and retain employees and tenants." (Compl. ¶ 44). Plaintiffs also generally allege that "the ability of Hartz to conduct its operations, and the ability of Hartz's employees to live and work in the Meadowlands area, will be hampered by the [Army] Corps' decision not to prepare or to require the preparation of an EIS which would have demonstrated the existence of these significant impacts upon the human environment of the Meadowlands." (*Id.*). In addition, Plaintiffs allege that the relief sought "will redress the injuries of Hartz and its employees by stopping the environmental degradation of the Meadowlands by requiring" the Army Corps to complete an EIS and Mills/Mack-Cali to mitigate environmental damage and develop less harmful alternatives. (*Id.*).

In Plaintiffs' Br., Plaintiffs make additional allegations explaining that Hartz owns a development named Harmon Meadow that is more than a mile from the Meadowlands Sports Complex. (Plaintiffs' Br. at 2). Plaintiffs argue that Hartz's "concrete and particularized injuries" are that "the traffic generated by Xanadu will interfere with the ability and willingness of these visitors to reach venues in the Meadowlands, including those in Harmon Meadow" and that "[t]he incremental traffic burden will reduce the desirability of [venues in the Meadowlands, including those in Harmon Meadow,] as business locations, and thereby depress property values and profitability from rental income, all to the great detriment of Hartz." (*Id.* at 3-4, 13, 19). A certification submitted by Michael Maris, Plaintiffs' traffic consultant, asserts that Xanadu will generate increased traffic that will cause delays and difficulties in passing through and accessing venues in the Meadowlands area and will have an "adverse impact on potential customers attempting to reach other retail, restaurant and entertainment venues in the Meadowlands, including those within Hartz' [*sic.*] Harmon Meadows," which impact "would naturally tend to

11

depress market leave rates, property values and landowner income streams." (Maris Cert. ¶¶ 40,

43, 69). A certification submitted by Constantino T. Milano, Plaintiffs' Executive Vice President

of Leasing and Finance, asserts that "traffic impact upon the roadways that serve the

Meadowlands directly impacts Hartz" because "Hartz and its employees use the roadways" for

commuting and business-related travel. (Milano Cert. ¶¶ 8-9). Mr. Milano asserts that increase

traffic generated by Xanadu will impact Hartz's operations because congestion will affect

employee travel; because Hartz's tenants and prospective tenants are "reluctant" or "refusing" or

"not interested" in leasing or investing in leasehold refurbishment; and because difficulty and

inconvenience of travel "will force customers to patronize businesses located outside of the

Meadowlands," thus decreasing the number of customers to Hartz's tenants, who will not renew

their leases. (Milano Cert. ¶¶ 8-14).

    The Complaint alleges and the certification of Plaintiffs' traffic expert, Mr. Maris,

supports the claim that Xanadu will generate increased traffic. Even assuming the truth of

Plaintiffs' contentions, however, under the circumstances presented here, increased traffic in the

Meadowlands region is by itself at best a general and amorphous harm and not the type of

particular, concrete, and litigant-specific injury that would support standing. *See Taubman*, 198

F. Supp. 2d at 757 ("Prevention of 'safety, environmental, and traffic' related negative impacts to

a 'region' clearly is not the type of concrete, litigant-specific interest upon which a party may

base a procedural injury.").

    Plaintiffs' allegations in the Complaint that the increased traffic generated by Xanadu will

negatively impact Hartz's business operations, which are more fully developed in Plaintiffs' Br.

and the certifications filed in support thereof, likewise do not state a cognizable injury in fact.

First, the Court does not believe that such allegations are sufficient to establish a litigant-specific, concrete and particularized injury as to Hartz.  However, even if these allegations were sufficiently concrete and particularized, they still fail to state an injury in fact because they are entirely conjectural.

Hartz's business related injuries are entirely conjectural, and thus cannot support standing, because they are not only unsupported, but also cannot even be articulated without phrasing them hypothetically.  Hartz provides no documentary evidence, analysis, or even examples of analogous circumstances to support the claim that Hartz's business operations will be negatively impacted by increased traffic or the related arguments made in Plaintiffs' Br. that traffic will affect the "willingness" of consumers to reach venues in the Meadowlands, including Hartz's, or will affect the "desirability" of those venues, thereby depressing property values and profitability from rental income.  Assuming that traffic will increase, Hartz will only be injured, for example, *if* customers seek alternative venues, and *if* tenants lose business, and *if* those tenants refuse to renew their leases, and *if* prospective tenants are dissuaded from leasing.  "One cannot describe how [Hartz] will be injured without beginning the explanation with the word 'if.'"  *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 297-98 (3d Cir. 2003) (finding no standing where alleged injuries were conjectural).  Hartz's prospective injuries, described by Plaintiffs as certain, "are, in reality, conjectural."  *Id.*  Indeed, Hartz's traffic expert, Mr. Maris, certifies that a result contrary to the theory of Hartz's business-related injuries is likewise possible:  "For places involving certain uses, such as local supermarkets, it is reasonable to assume that some of the vehicles that go to the place of business would not have stopped if the drivers had not already been traveling the adjacent highway on their way to another destination."

13

(Maris Cert ¶ 12).  Accordingly, Hartz's business related injuries are entirely conjectural and thus cannot support a cognizable injury in fact.  *Cf. Storino*, 322 F.3d at 297-98.

Because Plaintiffs have failed to establish a cognizable injury in fact as to Hartz, Hartz lacks standing.  *Society Hill Towers Owners' Assoc. v. Rendell*, 210 F.3d 168 (3rd Cir. 2000), the case on which Plaintiffs principally rely, does not dictate a contrary result.  In *Rendell*, the Third Circuit held that a group of residents of a particular neighborhood, Society Hill, in Philadelphia, Pennsylvania had standing to sue the Mayor of Philadelphia, the Secretary of Housing and Urban Development, and the Department of Housing and Urban Development ("HUD"), challenging HUD's approval of a grant to Philadelphia to assist in funding development of a hotel and parking garage in Society Hill.  *Rendell*, 210 F.3d 168.  The residents all lived in Society Hill and enjoyed the amenities of a historic district adjacent to, and included within, Penn's Landing and the Delaware River waterfront.  *Id.* at 176.

*Rendell* did not hold that increase traffic alone is *per se* a sufficient injury to confer standing.  Rather, the Court held that, under the circumstances therein presented, the residents "alleg[ed] injury to a legally protected interest -- that of maintaining the environmental and historic quality of their neighborhood" and that the residents sufficiently alleged a "concrete and particularized injury" in the form of "increased traffic, pollution, and noise that will detrimentally impact the ambiance of their historic neighborhood and their ability to use and enjoy Penn's Landing waterfront" and "the impact of the proposed project on their neighborhood will decrease their property values."  *Id.* at 176.  Thus, the *Rendell* plaintiffs alleged a number and variety of injuries, which the Third Circuit together found to be sufficient under the circumstances therein presented.

14

Moreover, in reaching its conclusion, the *Rendell* Court emphasized that the alleged injury was not a region-wide, or even city-wide effect, but rather that the injury "'hits them where they live,'" in "their neighborhood." *Id.* at 177.  Plaintiffs allege that Xanadu will generate increased traffic on the roadways of the Meadowlands region, which will make commuting in the region more difficult for employees and consumers.  In addition, the Court noted that the fervor of the residents' interest was well-established, and that while such fervor is plainly insufficient in itself to create standing, "the intensity of the Residents' opposition. . . is relevant to an evaluation of whether they have a sufficient interest in the outcome to have standing." *Id.* at 177 n.6.  Far different from the situation of the *Rendell* plaintiffs, Hartz submitted its own, unsuccessful proposal to redevelop the Continental Airlines Arena site, which also called for the filling of the wetlands that are the subject of the challenged Permit.  Prior to the loss of its bid to its competitor Mills/Mack-Cali, Hartz appears not to have opposed the filling of the almost 8 acres of wetlands.  Similarly relevant to whether the residents had a sufficient interest in the outcome was that "no assertion [had been made] that these claims are disingenuous or that the Residents claim these injuries merely to manufacture a jurisdictional case or controversy that would not otherwise exist." *Id.* at 176-77.  Just such an assertion has been made in this case.  (*See* Army Corps Br. at 4 n.2; Mills/Mack-Cali Br. at 1-2; Cert. of Michael R. Cole Ex. 5).

## 2.  Plaintiffs Have Not Established an Injury In Fact as to Mr. Gentile

Plaintiffs likewise fail to state a cognizable injury in fact as to Mr. Gentile.  Plaintiffs allege that Mr. Gentile travels on the roadways in and around the Meadowlands, that Mr. Gentile often finds traffic along these arteries to be severely congested, and that Mr. Gentile "is concerned that the additional traffic that would be generated by a project of the size of Xanadu

would cause the existing traffic conditions on the roadways of the Meadowlands to become

significantly worse, causing additional lost time, increased frustration and a deterioration in the

quality of life for people like himself who work and visit the Meadowlands."[8] (Compl. ¶ 45). In

Plaintiffs' Brief, Plaintiffs argue that Mr. Gentile's "concrete and particularized injuries" are that

"[t]he paralyzing wall of traffic congestion caused by Xanadu will also frustrate the efforts of Mr.

Gentile to commute along Route 3 between his home and his workplace and his desire to

continue his custom of traveling to dining and entertainment venues around the Meadowlands

after work and on weekends." (Plaintiffs' Br. at 4, 14, 19). Finally, in Mr. Gentile's

certification, he discussed the present traffic situation in and around the Meadowlands along with

his use of the roadways and elaborates on the impact of heavy traffic on his life. (*See generally*

Gentile Cert.). Mr. Gentile asserts, for example, that "[d]riving in long traffic back-ups is

annoying and unpleasant" and "[w]hen I am driving to work-related meetings, traffic delays

waste time, frustrating my ability to complete my work in a timely fashion" and that "[t]he

increased traffic from Xanadu will exacerbate these problems." (Gentile Cert. ¶ 12). Mr. Gentile

also asserts that his ability to schedule meeting will become more difficult. (*Id.*). Finally, Mr.

Gentile reports that the traffic will prevent his from engaging in leisure activities and from

traveling to places he would normally use and will delay his reaching home and thus adversely

affect his personal life. (*Id.* ¶ 13).

Plaintiffs have failed to state a cognizable injury in fact as to Mr. Gentile. Mr. Gentile's

---

[8] Although Plaintiffs frame their allegations in terms of injury to Mr. Gentile and "people like himself," Plaintiffs cannot assert injury on behalf of such other "people" because Plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975).

"concern[]" and the "frustrat[ion]" of his efforts at commuting to and desire to continue visiting Meadowlands venues are not sufficiently concrete and particularized injuries under the circumstances presented.  Instead, Mr. Gentile's alleged injuries are nothing more than generalized, amorphous grievances shared by the public at large and their redress would no more directly and tangibly benefit Mr. Gentile than it would the public at large.  *See Taubman*, 198 F. Supp. 2d at 757.

Plaintiffs' arguments to the contrary notwithstanding, Mr. Gentile is not situated like the plaintiffs in *Rendell*, who were a small group of residents in the particular historic neighborhood in which the federally-funded project was to be developed.[9]  Rather, Mr. Gentile's posture is analogous to *Rendell*'s "illustrative, hypothetical steelworker" from a different neighborhood who could support his family by working on the project, who the Third Circuit indicated would not have standing.  *Rendell*, 210 F.3d at 177.  While all the residents of Philadelphia, like the hypothetical steelworker, may have had an interest in the project at issue, the Court stated that the interest of the residents of the particular historic neighborhood in which the construction was planned was "qualitatively different, and far more immediate and focused."  *Id*.  Thus, the residents were asserting sufficiently concrete, particularized, and litigant-specific grievances to satisfy the injury in fact prong of the standing inquiry.  *Id*.  As a resident of the same general region in which Xanadu is being developed, but certainly not the same neighborhood,[10] and a

---

[9] *See also* discussion of *Rendell*, *supra*.

[10] Mr. Gentile's residence in Wayne, New Jersey appears to be between 15 and 20 miles from the Meadowlands Sports Complex in East Rutherford, New Jersey.  (Gentile Cert. ¶ 2); www.mapquest.com.  Mr. Gentile represents that his weekday commute requires him to travel, in addition to other roadways, along Route 3 for about 10 miles from his residence in Wayne, New Jersey to his place of employment in Secaucus, New Jersey.  (Gentile Cert. ¶ 3).

person who commutes on the roadways of and visits the Meadowlands region, Mr. Gentile's interest in the Xanadu project is akin to the interest of *Rendell*'s hypothetical steelworker who resides elsewhere in Philadelphia and who could support his family by working on the project. Like the interest of the hypothetical steelworker, Mr. Gentile's interest is qualitatively different from the type of immediate and focused interest that would support standing. The interests asserted by Mr. Gentile are generalized, amorphous, and common to anyone and everyone living, working, and commuting in the affected region. *See Taubman*, 198 F. Supp. 2d at 757. Such injuries do not give rise to Article III standing. *See Lujan*, 504 U.S. 573; *Taubman*, 198 F. Supp. 2d at 757.

### 3. Conclusion

In sum, Plaintiffs cannot satisfy the constitutional requirements for standing because, even accepting as true the material allegations of the Complaint, construing those facts in Plaintiffs' favor, and considering the certifications filed in support of Plaintiffs' Br., Plaintiffs have not sufficiently alleged an injury in fact that is concrete, particularized, or actual. The only injuries that Plaintiffs have demonstrated are generalized and conjectural.

### C. Plaintiffs Have Failed to Establish that Their Alleged Injuries Are Fairly Traceable to the Challenged Army Corps Action

To establish standing, a plaintiff must demonstrate "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. 560-61 (internal citations and quotations omitted). The causal connection aspect of standing requires that the injury be fairly traceable to the challenged conduct of the defendant and not be a result of independent actions of third parties

18

not before the court.  *Id.*  This element ensures that a genuine nexus exists between a plaintiff's injury and a defendant's alleged illegal conduct."  *American Littoral Soc. v. EPA*, 199 F.Supp.2d 217, 232 n.9 (D.N.J. 2002).

The gravamen of Plaintiffs' Complaint is that the Army Corps illegally issued the Permit authorizing the fill of approximately 8 acres of wetlands at the site on which Xanadu is being developed.  (*See, e.g.*, Compl. ¶ 1).  Plaintiffs do not, however, make any allegations that the allegedly illegally authorized filling of wetlands will directly injure them.  For example, Plaintiffs do not allege that they use and enjoy the wetlands that will cease to exist, or any other wetlands, for aesthetic or recreational purposes.  Instead, throughout the Complaint, Plaintiffs allege that the construction and operation of the Xanadu project will generate traffic, which in turn will injure Plaintiffs as discussed above.[11]  Plaintiffs fail to demonstrate the nexus between the challenged conduct – the Army Corps's alleged illegal approval to fill the almost 8 acres of wetlands – and the anticipated increase in traffic that will ultimately cause injury to Plaintiffs.

First, Plaintiffs fail to allege a "genuine nexus" between the Army Corps's issuance of the Permit and Plaintiffs' ultimate injuries as discussed above.  *See American Littoral Soc.*, 199 F.Supp.2d at 232 n.9.  Plaintiffs' most direct relevant allegation in the Complaint states that "the ability of Hartz to conduct its operations, and the ability of Hartz' [*sic.*] employees to live and work in the Meadowlands area, will be hampered by the Corps' [*sic.*] decision not to prepare or to require the preparation of an E[nvironmental ]I[mpact ]S[tatement] which would have

---

[11] While Plaintiffs allege different ultimate injuries, as discussed above, all such injuries stem from the anticipated increase in traffic generated by Xanadu.  Accordingly, for purposes of the causal connection aspect of standing, Plaintiffs' allegations relating to Hartz and Mr. Gentile dovetail and the Court will address them in unison.

demonstrated the existence of these significant impacts upon the human environment of the Meadowlands."  (Compl.¶ 44).  Reading the Complaint liberally, Plaintiffs' allegation can only be that traffic is what hampers the ability of Hartz to conduct its operations.  No other cause of Plaintiffs' injuries is alleged in the Complaint or in Plaintiffs' Br.[12] or the supporting certifications.  However, Plaintiffs make no showing that the Permit authorizing the fill of approximately 8 acres of wetlands will generate increased traffic, as discussed below.

       Plaintiffs do not allege that their injuries are fairly traceable to the challenged Army Corps action because they cannot do so.  The traffic impacts are a result of the nature and scope of the overall redevelopment project, as well as land use and transportation measures, as proposed and ultimately authorized by the NJSEA in conjunction with other state agencies.  Plaintiffs allege no link between the anticipated increase in traffic and whether the Xanadu project is constructed in part on wetlands entirely or entirely on non-wetland property.  As Plaintiffs' allegations are pleaded, even if Xanadu were constructed on those portions of NJSEA's property that did not contain wetlands, thus obviating the need for an Army Corps fill permit, Plaintiffs would still incur the same injuries.  Indeed, Hartz's own competing proposal for redevelopment of the Continental Airlines Arena site called for filling wetlands and thus also would have required Hartz to obtain authorization from the Army Corps.

       Second, Plaintiffs' allegations fail to demonstrate that the anticipated increase in traffic, as well as Plaintiffs' ultimate injuries stemming therefrom, are not attributable to independent

---

[12] While in Plaintiffs' Brief, Plaintiffs baldly assert that "Plaintiffs' injuries are causally connected to the Permit. . . .", Plaintiffs conduct no analysis of whether the alleged injuries are causally connected to the Army Corps action, but rather address whether the injuries are temporally remote.  (Plaintiffs' Br. at 22-23).

actions of third parties not before the court.  *See Lujan*, 504 U.S. 560-61.  As an initial matter, the NJSEA and other state agencies have control over decisions relating to the redevelopment of the Continental Airlines Arena site as well as associated land use and transportation measures that plainly impact the potential traffic effects of Xanadu.  No such parties are before the Court. In addition, Plaintiffs have not shown that the anticipated traffic impacts and the alleged injuries stemming therefrom are not attributable to independent decisions by commuters, consumers, other developers, and other retailers and businesses, who are also not before the Court.  In fact, Plaintiffs' allegations actually make plain that their injuries are directly attributable to decisions and conduct of third parties.

With respect to the anticipated increase in traffic and the resultant impacts on Hartz and Mr. Gentile, Plaintiffs' own allegations make clear that the magnitude of traffic on the roadways in and around the Meadowlands is impacted by a variety of factors, including rainstorms, police activity, events taking place at the Continental Airlines Arena, and independent commuting choices of other drivers.  (Gentile Cert. ¶¶ 6-8).  Moreover, with respect to Hartz's business-related injuries, Plaintiffs allege that Hartz will be injured as a result of commuting and travel decisions of employees and others, since traffic is allege to have a negative impact on the "ability and willingness" of individuals to travel to Hartz properties in the Meadowlands; of decisions of customers concerning whether to patronize venues in the Meadowlands, since traffic is alleged to reduce the "desirability" of such venues to consumers or others; and of decisions of Hartz's tenants and prospective tenants concerning whether to renew their leases or otherwise invest in leaseholds at Hartz properties, which is in turn dependent on the decisions of customers concerning which venues to patronize.  (Plaintiffs' Br. at 3-4; Milano Cert. 8-14).  Such

allegations necessarily rely on independent purchasing, leasing, renting, commuting, and other actions and decisions of third parties who are not before the Court.

Because Plaintiffs have failed to demonstrate a causal connection between Plaintiffs' alleged injuries and the challenged conduct, Plaintiffs lack standing.

## VI.  CONCLUSION

Plaintiffs have failed to establish at least two of the necessary constitutional elements of standing:  injury and fact and causal connection.  Because Plaintiffs lack standing, Plaintiffs' Complaint is dismissed with prejudice.  An appropriate order will follow.

s/ Joel A. Pisano         
JOEL A. PISANO, U.S.D.J.

DATED: October 25, 2005